## TITLE TO RAILROAD EASEMENT TILLED BY ADJOINING OWNER FOR MORE THAN TWENTY-ONE YEARS.

[Common Pleas Court of Auglaize County.]

JOSEPH HAPP ET AL v. THE DAYTON & MICHIGAN R. R. CO. ET AL.

Decided, September, 1903.

*Title—By Adverse Possession—Of a Railroad Easement—What Constitutes Notice of Claim of Title—Naked Possession—Tilling of the Soil—Temporary Improvements—Possession, Whether Permissive or Hostile—When the Statute Begins to Run.*

1. The holding in *Day* v. *Railroad*, 41 O. S., 392, relating to the extent of a railroad right of way, can not operate to divest an innocent purchaser of title to land conveyed by metes and bounds or other specific description, when the conveyance does not infringe on the railroad company's then apparent necessities, and its title is based upon a release which was not filed for record until forty years after the strip in question was conveyed to plaintiff's grantor.

2. Possession for more than twenty-one years of a strip of ground belonging to a railroad easement, does not become hostile and adverse by the raising of vegetables or the gathering of apples thereon or the occasional repair of the fence enclosing the strip, where it appears that the original construction of the fence and use of the ground was permissive on the part of the company, until such time as its easement should be needed for railroad purposes.

MATHERS, J.

Jury waived; trial to court.

There can be no doubt as to plaintiffs' title to that part of lot 359 (old No. 390), covered by the defendant railroad company's release. Smith executed this release March 3, 1854. It was not filed for record until October 13, 1896, forty-two years afterward. The statute in force at the time of its execution expressly provided that instruments conveying or affecting title to real estate should be deemed fraudulent as to subsequent bona fide purchasers unless recorded within six months. Plaintiffs' grantor obtained title to lot 359 from Smith on February 18, 1856, and had his deed recorded within the time prescribed by law. So far as appears from the evi-

dence he had no express or constructive notice of Smith's prior grant of part of lot 359 to the railroad company. It was not in the actual possession, *pedis possessio*, of more ground than lay west of the old fence which was torn down by Joseph Happ in 1891. The decision in *Day, Williams & Co.* v. *Railroad Company*, 41 O. S., 392, cited by defendant, relating to the extent of a railroad right of way, can not operate to divest an innocent purchaser of title to land, conveyed by metes and bounds or other specific description, when the conveyance does not infringe on the railroad company's then apparent necessities. In other words, it is not a necessary implication from that decision that a right of way must be one hundred feet or any other number of feet in width. As the defendant railroad company, in the case at bar, was maintaining and operating its road, at the time of the purchase by plaintiffs' vendor, without using this twenty-foot strip and without any then apparent necessity for its future use, it can not be held that he found the defendant railroad company in possession of part of lot 359 when he bought it. *McKenzie* v. *Perrill*, 15 O. S., 162, and *Williams* v. *Sprigg*, 6 *Ib.*, 585, cited by defendant, do not, therefore, apply.

The difficult question in this case is as to plaintiffs' claim to the twenty-foot strip lying outside of lot 359 and inside and through lot 358. Counsel for defendant are mistaken when they say that plaintiffs, in their petition, do not claim anything outside lot 359. An examination of the petition will disclose that they assert title to so much of lot 358 as constitutes a strip twenty feet wide, west of, parallel with, and immediately adjoining defendant railroad company's new fence erected in 1896. Plaintiffs claim title to this strip by prescription only, for it was never conveyed to them nor their ancestor or his vendors. Caspar Smith, the common source of title, did convey or release to the railroad company this strip of land through lot 358. The question is, did the railroad company lose title to this strip by the adverse possession of plaintiffs and their antecedents in title or possession? Admittedly they entered on this strip without color of title. And while color of title is not necessary to obtain title by adverse possession (*Lessee of Paine* v. *Skinner*, 8 O., 167; *Yetzer* v. *Thoman*, 17 O. S., 130; *McNeely* v. *Langan*, 22 O. S., 32), yet one having no title or color of title

must present most unequivocal evidence of his intention to hold by adverse possession (*City of St. Louis* v. *Gorman*, 29 Mo., 593; s. c., 77 Am. Decns., 586). Does the evidence show a title, by adverse possession, in the plaintiffs?

From the proofs and admissions offered and made, and the presumptions arising therefrom, it appears that Caspar Smith owned lots 358 and 359 on March 3, 1854, at which time he released to the Dayton & Michigan Railroad Company, for a railroad right of way, a strip 100 feet wide through them, and that he retained the fee in these lots until, on February 18, 1856, he conveyed the fee in lot 359 to Dr. Gottefrey, retaining the fee in lot 358. Sometime between March 3, 1854, and the year 1862, a fence was constructed practically parallel with and on the east side of the railroad. This fence remained there, gradually falling into decay, until 1891, when Joseph Happ, one of the plaintiffs, removed what was left of it (B. E., p. 8). The proof is absolutely silent as to who built this fence or when it was built. Dr. Berlin testified that it was there when he moved to Wapakoneta forty-one years ago, and that Dr. Gottefrey lived there then, presumably on lot 359, for that was the only land he got title to and there is no evidence of any building on lot 358 at any time. The proof shows that Frank Happ, the ancestor of plaintiffs and under whom they claim, obtained a conveyance of lot 359 on July 5, 1867; and that from then until defendant erected its new fence in 1896, the Happs cultivated a part of this twenty-foot strip in controversy. There is no doubt but that they have been in the open possession of this strip for more than twenty-one years, but the question is as to the character of that possession, whether hostile and adverse to the title of defendants or in subordination thereto.

From all that appears in evidence, the Happs went into possession of this strip and continued therein just as their predecessors in title had done. Neither plaintiffs nor their ancestor ever made any claim of title, nor ever did anything indicating their possession to be hostile and adverse to the title of the railroad company, unless the raising of vegetables on the disputed strip, or the gathering of apples, in common with the boys of the neighborhood, from the tree standing on the southerly part of the strip, can be said to in-

dicate an adverse, or hostile, possession; for, while Miss Happ tes-
tified that her father occasionally repaired the fence, it satisfactorily
appears that they found the fence already there and did not renew
it, by putting in posts and such permanent repairs, but suffered it
to fall down and finally to disappear in 1891. Plaintiffs introduced
some evidence to the effect that their ancestor, when the railroad
company was building the new fence, protested, and that one of
plaintiffs—Miss Happ—also protested. She said, on this point,
"I said I didn't intend to have that fence in front of our house,
and my father said so also." This protest was against the building
of a fence at all, and not against its location on any particular line.
It does not show an invasion by the railroad company of any ground
claimed by plaintiffs or plaintiffs' ancestor, and the latter did not
thereby point out what he claimed his lot was; so that, as a state-
ment by one in possession as to the extent of his boundaries, it
fails to prove anything. The house then occupied by plaintiffs'
ancestor fronted on the railroad, and the construction of the kind
of fence built by the railroad company would obstruct the view from
that lot, as well as ingress and egress to and from it in that
direction, and it is inferable from the evidence, especially of
Dr. Berlin, that the railroad was not uncommonly used as a
thoroughfare by pedestrians. In fact, it is a matter of common
knowledge that railroads in municipalities are frequently so used.
For the preceding five years there had been no fence at all between
the railroad and the house, and prior to that period the fence that
was there was falling to pieces, having openings in it which made
it useless to turn stock or keep out intruders. Indeed, had Frank
Happ really claimed this part of lot 358 as his own, it would have
been natural for him, in such circumstances of invasion of a right,
to have more vigorously protested against the location of the fence
and to have said something as to the location of his claimed
boundary.

Mere naked possession, no matter how long, without a claim of
right, never ripens into a good title, but is regarded as being held
for the true owner (*Creekmur* v. *Creekmur,* 75 Va., 130; *Maple*
v. *Stevenson,* 122 Ind., 368). In *Smith* v. *Burtis,* 9 Johns., 180,
the court said:

"The possession for ever so long a time, stripped of the circumstance that it is unaccompanied with the claim of the entire title, will not amount to an adverse possession barring those who have the real and legitimate title."

In *Dietrick* v. *Noel,* 42 O. S., 18, 21, our Supreme Court said:

"The very essence of an adverse possession is, that the holder of it claims the right to his possession, not under, but in opposition to the title to which his possession is alleged to be adverse."

But a verbal assertion of claim is not essential, if all claimant's acts indicate ownership (1 A. & E. Ency. Law, 797, 2d edition).

Are the acts of the plaintiffs and the antecedent owners of title to lot 359 and possessors of the strip in question, hostile to the title of the railroad company and inconsistent therewith? I think not. Caspar Smith released to the railroad company a right of way only. He did not convey the fee. It remained in him, and so far as appears, is still in him or his heirs, or the plaintiffs herein by adverse possession as against Smith. Retaining the fee to the land, he might have used it in any way not inconsistent with its legitimate use by the railroad company for railroad purposes. In *Railway Co.* v. *Allen,* 22 Kans., 285, it was held that inclosure and cultivation by adjoining land owners of a railroad right of way was not decisive of their adverse possession, as they owned the fee and might use the land in any way not inconsistent with its use by the railway company. As was said in that case, so it might be said in this, that the grant of such an extensive right of way is evidence of an intention that it might be enjoyed or used by the railroad company whenever its business or necessities demanded. To the same effect is *U. P. Ry. Co.* v *Kidred, Trustee,* and *Barnwell.* 23 Pac. Rep., 112; *Railway Co.* v. *Harris,* 28 Kans., 206; and supporting that principle is *McClelland* v. *Miller,* 28 O. S., 488, 502. In the latter case, at p. 502, our Supreme Court said:

"The fact that a portion of the highway remains in the possession of adjoining owners, is merely matter of sufferance from which rights can not accrue. If, as in 5 O. S., 594, such proprietor should erect permanent improvements upon the ground in question, indicating an intention permanently to appropriate the land, a question

of adverse possession might arise. * * * A fence is not such permanent improvement; nor does the fact that a hedge was planted vary the case. The public have a mere easement for the road. The proprietor still owns the fee, and may use it in any way not inconsistent with the purposes of the road. He may plant trees; he is entitled to the herbage; and the setting out of a hedge entirely comports with his own rights, while it does not conflict with those of the public."

The foregoing case was one involving a public highway, but it is difficult to see, from the court's reasoning, anything to differentiate it from the case at bar. In *Reynolds* v. *Newton,* 14 C. C., 433, 434, it was held:

"* * where it appears that land, part of a dedicated and accepted street, while yet unopened and unimproved, was fenced in by an adjoining owner for twenty-one years, such fact is only one element of evidence necessary to establish his right to possession and would not be conclusive to establish such right. The question remains, under what circumstances and claim the fence was built and maintained."

As it appears the Happs did not build this fence, but found it there when they took possession of lot 359, and did not make any permanent repairs or maintain it as a permanent inclosure, but apparently accepted the situation as they found it, it becomes material to inquire when and by whom, and under what claim this fence was built. For if any of their predecessors in possession entered upon the strip, or being lawfully in possession did anything indicating an adverse holding, so as to start the statute of limitations running, the statute would continue to run until the title of the railroad company was barred, and the strip might pass to subsequent grantees of lot 359 as a sort of appurtenance.

As was said before, the proof is absolutely silent as to when and by whom this fence was built. In the absence of proof the court is compelled to reason from the natural probabilities. And, in view of all the circumstances, it is more probable that Smith, rather than Gottefrey, fenced off this twenty-foot strip. That one of them did is shown by the fact that the only evidence throwing light on the age of the fence is that it was there in 1862, and that

Dr. Gottefrey lived there then. It could hardly have been built when Smith released to the railroad company, but if it was, its maintenance thereafter must be regarded as permissive on the part of the railroad company, at least as far as Smith is concerned. But, assuming it to have been built between the date of Smith's release to the railroad company—March 3, 1854—and 1862, it seems more probable that Smith, rather than Gottefrey, built it. The railroad company would have been more likely to acquiesce in such conduct on Smith's part than on that of Gottefrey, inasmuch as that of the former would not operate to divest its title, while that of the latter might. For when the railroad company took possession of its right of way, and built its road thereon—which it did sometime between March 3, 1854, and the year 1856 (B. E., p. 2) —Smith was the owner and in possession of both lots 358 and 359, and it must be held, so far as he is concerned, that the railroad company took possession of the whole width of its right of way, for it entered under color of title from Smith (*Humphries* v. *Huffman,* 33 O. S., 395). It was then common, and is yet not unusual, especially in new country, for railroad companies to permit the adjoining landowner to cultivate portions of their rights of way not needed for railroad purposes. And such use by Smith of the part of the easement he had given the railroad company not needed at that time by the company, but intended by both to be given up when it was needed, seems the most rational guess as to the origin of the fence that can be made in the entire absence of proof. This conclusion is the proper one in view of the rule of law applicable to such a situation. It is well stated in *Jackson* v. *Parker,* 3 Johns. Cases, 124, where the court said:

"An entry adverse to the lawful possessor is not to be presumed. It must appear by proof," etc.

And again, in *McCabe* v. *Kenny,* 52 Hun. (N. Y.), 514, it was said, a possession is not shown to be adverse if it does not clearly appear under what claim, whether of title or otherwise, the party was in possession.

If the inception of this use by the adjoining land-owner was permissive, it will be presumed that that condition continued until

a different one is shown, by proof, to have arisen (*Hall* v. *Stevens,* 9 Met., 418). If the act or declaration of a former owner of real estate is evidence of the nature or extent of his possession, then it must follow that the successors in title of Smith to lot 359 can not be said to hold any differently, or to hold the adjoining strip in lot 358 adversely, until they or some of them do something inconsistent with or hostile to the railroad company's title—something equivalent to notice of an adverse holding (*Martin* v. *Jackson,* 27 Pa. St., 504; s. c., 67 Am. Decns., 489; *Sneeberg* v. *Cunningham,* 96 Mich., 378; s. c., 35 Am. St. Rep., 613). In the latter case the court said: The statute of limitations begins to run in favor of the party in possession only from some act of possession so open, notorious and hostile that it constitutes, in law, notice to the real owner. In *Evans* v. *Welch,* 29 Cal., 355, s. c., 68 Pac. Rep., 776, it was held that when the purchaser of lots claimed an adjoining strip by virtue of possession of himself and his grantors, but the record title of such strip was in another, and there was no direct evidence that the possession of the grantors was adverse, the rule that the holder of the legal title was in constructive possession controls; and no presumption of adverse possession or of intention to grant the adjoining strip can be indulged in defendant's favor, merely because the transactions were remote in time and such evidence difficult to obtain. And in *Nicholas* v. *Reynolds,* 1 R. I., 30, s. c., 36 Am. Decns., 239, it was held that the possession of one having a right of possession under one title, but claiming under another, the latter being adverse, the former not, is deemed to be a possession under the title not adverse. The inception of the possession of this strip not having been shown to be adverse to the railroad company's title; and neither Smith nor any of his successors in title to lot 359, nor those subsequently in possession of this strip through lot 358, having been shown to have made any claim of right or title to it, nor to have done anything new or different, while they possessed it, than Smith had done, and none of them having erected any permanent structures, or made any permanent repairs with reference to or evidencing a claim of right on their part to this strip, the court can only conclude that the possession was originally permissive, and that it

continued so until resumed by the railroad company in 1869, and that the plaintiffs are not entitled to the same.

The court, therefore, finds that plaintiffs are entitled to the possession of the following described real estate, situated in Auglaize county, Ohio, and in the village of Wapakoneta therein, viz.: A part of lot No. 359, as the same is known and designated on the plat of said village, being a strip of land twenty feet (20 feet) wide, extending through said lot, parallel with and immediately adjoining on the west a line projected through said lot running parallel with the center line of the main track of the Dayton & Michigan railroad and forty-nine (49) feet distant, eastwardly, therefrom, measured at right angles thereto. And the court further finds that as to the remainder of the land described in plaintiffs' petition, being a continuation of said twenty-foot strip through lot 358 in said village, parallel with the center line of said railroad, the plaintiffs are not entitled to its possession, but that the defendants are.

There was no evidence offered of any injury sustained by plaintiffs by reason of the trespass by defendants, and the erection of their fence through said lot 359. As the fence, however, stands diagonally across the northwest corner of said lot, and serves no useful purpose to its owners, it will probably have to be removed For this trespass and injury, the court, exercising its common knowledge as to what the probable cost of restoring the lot to the condition it was in before the trespass, finds plaintiffs are damaged in the sum of ten dollars ($10), and are also entitled to their costs.

Judgment in accordance with the foregoing finding.

*R. D. Marshall* and *Layton & Son,* for defendants.

*Goeke & Hoskins,* for plaintiffs.